In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 15-1659

BRIAN HERRON,

*Plaintiff-Appellant,*

*v.*

DOUGLAS MEYER,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:13-cv-109-JMS-WGH — **Jane E. Magnus-Stinson**, *Judge.*

_____

SUBMITTED MARCH 18, 2016 — DECIDED APRIL 25, 2016

_____

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* In this *Bivens* suit, Brian Herron, a disabled federal prisoner, accuses guard Douglas Meyer of transferring him to a cell that the guard knew was likely to cause him injury. Meyer did this, Herron alleges, because he disliked the fact that Herron had filed grievances and had refused to share a cell with an inmate who he thought endangered him. Herron maintains that Meyer vio-

lated the First and Eighth Amendments. The district court dismissed the First Amendment theory and held that the guard is entitled to qualified immunity on the Eighth Amendment theory. 2014 U.S. Dist. Lᴇxɪs 20865 (S.D. Ind. Feb. 20, 2014) at *7–9 (First Amendment); 2015 U.S. Dist. Lᴇxɪs 28263 (S.D. Ind. Mar. 9, 2015) (Eighth Amendment).

We report the facts of record in the light most favorable to Herron. A former gang member, he is serving long sentences for bank robbery and other crimes. Before his transfer to the prison at Terre Haute, where the events we narrate occurred, he had been attacked by other inmates at a different prison and left permanently disabled. He is confined to a wheelchair and is incontinent, though usually he has a brief time to make it to a toilet before soiling himself. When arriving at Terre Haute, Herron was assigned to a cell designed for wheelchair-bound inmates. Among other features, the cell has grab bars that inmates can use to transfer safely from a wheelchair to a bed or toilet; it also has a shower that the occupant can use to clean up if he does not make it to the toilet in time.

Herron originally believed that the persons who injured him did so as part of gang warfare, but he was told by some inmates at Terre Haute that he had been targeted because they believed him to be a pedophile. Herron checked and found that, indeed, his prison records contained references to the Adam Walsh Child Protection and Safety Act, 42 U.S.C. §§ 16901–91, even though his convictions are for other crimes. He filed a grievance asking the prison to correct his records and a request under the Privacy Act asking the Bureau of Prisons to do so. The Bureau made the change, but

the news may not have reached the prison until after the events we narrate.

On being told that some other inmates, believing him to be a child molester, were planning to attack him anew, he asked to be placed in segregation. The prison complied. The segregation unit has wheelchair-accessible cells, and Herron was assigned to one. Another inmate joined him a few days later (it was a two-person cell), and within the month attacked him over his "Walsh Act stuff." The attacker was removed, and Herron again had the cell to himself.

Before the month was out, Meyer arrived with a new cellmate for Herron. The two prisoners discussed whether they could tolerate each other, and when the newcomer told Herron that he was being moved because he had just attacked his former cellmate, Herron objected. Meyer took the other prisoner away, then came back and took Herron away. Meyer demanded of Herron to know "what your problem is" and, when Herron replied that he just wanted to be safe, Meyer replied: "Well, don't you have a Walsh Act assignment? We didn't put it on you here at Terre Haute, so quit filing." Visibly angry, Meyer continued: "you are not going to sit in my [special housing unit] living high on the hog. I have something in store for you."

Having said that, Meyer and some other guards carried Herron to a non-wheelchair-accessible cell. It lacked grab bars, it lacked a shower, and it had a concrete bed that a wheelchair-bound inmate would find hard to use. Herron protested, but Meyer replied that he would be in that cell for "the next couple of days or so" and warned Herron not to "hit the duress button unless it was a life-threatening situation." When Herron next needed to use the toilet, he asked

guards for help. They refused. Without the aid of grab bars, Herron fell when trying to get out of his wheelchair and struck his head. He was found lying helpless with his head near the toilet. He was taken to a hospital and treated for injuries that included a laceration to his temple, a contusion to one shoulder, and a sprained spine.

The district court analyzed Herron's Eighth Amendment theory as if he were contending that the Constitution requires grab bars for all wheelchair-bound inmates, all the time. Finding that it does not—and adding that Meyer likely anticipated that other guards would help Herron use the toilet in his new cell—the court concluded that Meyer is entitled to qualified immunity.

Some of Herron's argument reads like an appeal to the medical-care principle of *Estelle v. Gamble*, 429 U.S. 97 (1976), and *Farmer v. Brennan*, 511 U.S. 825 (1994). But Herron, who was proceeding without the assistance of counsel, should not be held to a lawyer's standard of articulating (and being bound by) a legal theory. His grievance more naturally sounds like a contention that Meyer decided to hand out on-the-spot punishment to an inmate who filed too many grievances and objected to potential cellmates.

It would violate the Due Process Clause or the Eighth Amendment, if not both, for a guard to clobber an inmate with a truncheon in order to penalize a request to correct prison records. Punishment is limited to that authorized by the judgment of conviction and the ordinary conditions of confinement, plus discipline that must be preceded by procedural safeguards. See *Wolff v. McDonnell*, 418 U.S. 539 (1974). The facts narrated by Herron suggest that Meyer, knowing that a blow was out of the question, decided to

achieve the same effect by moving Herron to a cell where he was likely to suffer an injury. And given the clearly established law that guards may not administer their personal brand of punishment, see *Hudson v McMillian*, 503 U.S. 1, 6–7 (1992); *Gilbert v. Cook*, 512 F.3d 899 (7th Cir. 2008), it follows that guards are not entitled to qualified immunity when they seize on what seems to them a clever way of achieving the same result.

Meyer insists that he was implementing a policy of moving every inmate who objects to a new cellmate, in order to prevent inmates from reserving one-person cells. Meyer says that he expected guards near Herron's new cell to assist him when necessary and believed that no harm would come to him. He told the district court that he did not say anything similar to the language Herron imputes to him—and that Herron, far from objecting to the new cell, consented to the placement. If the jury believes this, then Meyer will prevail. But on motion for summary judgment we must take Herron's view of matters, and if a jury believes Herron and concludes that Meyer moved him to a new cell hoping that he would be injured, then Herron is entitled to damages.

Herron maintains that Meyer violated the Free Speech Clause (or perhaps the Petition Clause) of the First Amendment, in addition to the Due Process and Cruel and Unusual Punishments Clauses. Piling up the legal theories would not add to the remedies, and the instructions in a case such as this should not tell the jurors about different legal theories. Jurors should be told what facts they need to find in order to support a decision for one side rather than another—and we have already explained that, if the jury finds the facts in Her-

ron's favor, then he wins. This makes it unnecessary to say much more about the First Amendment theory.

The district court dismissed the First Amendment theory on the pleadings after observing that, although inmates have a right to speak, they do not have a right to one-person cells. Justice Holmes would have approved. He once remarked: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. New Bedford*, 155 Mass. 216, 220 (1892). Modern doctrine asks, however, whether a price has been attached to protected speech. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741–43 (2011); *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 673–75 (1996).

Herron and the district court refer to this as a "retaliation" theory, but we avoid that word. *All* penalties for speech could be called retaliatory, so the word does not add anything and has some potential to confuse matters, as it did in *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

If Meyer set out to punish Herron for his grievances, then a price has been attached to speech. The district court thought otherwise in part because Herron had not attached his grievances to the complaint, but that was not necessary; a complaint narrates a claim and need not supply the proof. That comes later. *Pratt v. Tarr*, 464 F.3d 730, 732–33 (7th Cir. 2006). And if, as we doubt, an amendment to the complaint was required, the district court should have allowed it rather than dismissing the claim. See, e.g., *Runnion v. Girl Scouts of Greater Chicago*, 786 F.3d 510, 519–23 (7th Cir. 2015).

Whether a penalty has been attached to *protected* speech is potentially more difficult. Many decisions assume that es-

sentially everything a prisoner says in the grievance system—if not everything a prisoner says to a guard—is protected by the First Amendment. See, e.g., *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Pearson v. Welborn*, 471 F.3d 732, 741 (7th Cir. 2006). These decisions do not discuss a parallel line of cases about grievances that public workers make about the conditions of their employment. That line of cases attempts to distinguish statements on topics of public importance (protected) from personal gripes (unprotected) and statements that disrupt the workplace (also unprotected). Compare *Connick v. Myers*, 461 U.S. 138 (1983), with *Rankin v. McPherson*, 483 U.S. 378 (1987); see *Pickering v. Board of Education*, 391 U.S. 563 (1968). The decisions in the prison-grievance line do not explain why the First Amendment offers greater protection to prisoners than to public employees. We do not get into that here, because the subject has not been addressed in the briefs. It is enough to flag the subject as worth attention, either in some future litigation or in this case if, contrary to our expectations, the First Amendment theory turns out to matter.

The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.