NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 11, 2022[*]
Decided April 19, 2022

***Before***

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 20-2926

| | |
|---|---|
| JEFFREY VOGELSBERG, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Western District of |
| | Wisconsin. |
| | |
| *v.* | No. 17-cv-596-jdp |
| | |
| YOUNG KIM, et al., | James D. Peterson, |
| *Defendants-Appellees*. | *Chief Judge*. |

**O R D E R**

Jeffrey Vogelsberg, now a convicted Wisconsin prisoner, sued medical providers at the Dane County Jail over events that occurred there when he was a pretrial detainee. The district court entered summary judgment for the defendants on Vogelsberg's claims that they provided objectively unreasonable treatment for his bleeding ulcer and

---

[*] We have agreed to decide the case without oral argument because the briefs and the record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

retaliated against him when he complained about poor medical care. Because no jury could reasonably find that Vogelsberg's medical treatment fell below constitutional standards or that he was punished for his speech, we affirm.

We recount the facts in the light most favorable to Vogelsberg. *See James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020). While in jail awaiting a trial, Vogelsberg spent weeks with severe abdominal pain. The day after he first requested treatment in July 2014, a nurse examined him and consulted with a jail doctor, defendant Young Kim. Suspecting a gastrointestinal issue, the doctor prescribed an antacid and a laxative to be used as needed, but he denied Vogelsberg's request for an x-ray. Vogelsberg declined to take the antacid because he felt it unnecessary. He was already on several medications, such as warfarin (a blood thinner), naproxen (a non-narcotic pain reliever), and psychiatric drugs for conditions including schizophrenia and post-traumatic stress disorder. Because warfarin increases the risk of bleeding issues, Vogelsberg received regular blood tests to assess his dosage and detect possible internal bleeding.

Vogelsberg continued to see medical staff over the next several weeks with complaints of abdominal pain. After an appointment in early August, Dr. Kim ordered tests, adjusted Vogelsberg's warfarin dose, and prescribed a fiber supplement (which Vogelsberg also declined to take). Later that month, Vogelsberg requested a renewal of his naproxen prescription and a new one for acetaminophen (another analgesic), both of which he received. Vogelsberg was seen again in early September after complaining of worsening pain and was given a blood test that did not indicate internal bleeding. The doctor advised Vogelsberg to inform a nurse if his symptoms did not resolve. Vogelsberg returned to the clinic several days later, again with severe abdominal pain. The doctor stopped all pain medications to avoid masking symptoms and ordered diagnostic tests, daily examinations, and a liquid diet.

Vogelsberg, whose criminal trial had begun, returned, unimproved, several days later. During this evaluation, Vogelsberg complained to Dr. Kim that his treatment thus far had been inadequate. He then reported that his pain was "excruciating," that he was nauseated, and that his last bowel movement—three days prior—produced black stool. The doctor now suspected gastrointestinal bleeding and ordered x-rays and observation in the clinic. Vogelsberg refused to assent to the medical observation, though, because he wanted to attend his criminal trial, and he believed the observation was retaliation for his complaint. No decision about observation was necessary, though: when the results of a blood test were abnormal, Dr. Kim sent Vogelsberg to a nearby emergency

department. There, he was diagnosed with intestinal bleeding caused by an ulcer and had surgery to correct the condition.

The day Vogelsberg went to the hospital, a correctional officer told a mental-health staffer that he feared Vogelsberg might be suicidal. During a monitored phone call, Vogelsberg had alluded to getting a gun; another inmate had expressed concern Vogelsberg planned to overdose on medication. A nurse learned that Vogelsberg had purchased 50 tablets of aspirin, although he knew he could not safely take it while on warfarin. Dr. Kim therefore referred Vogelsberg for a psychological evaluation when he returned from the hospital. Though a hospital blood test showed no signs of aspirin overdose, Vogelsberg was placed under "self-harm watch," which involved isolation and deprivation of his clothes and possessions. A psychiatrist determined that Vogelsberg was not suicidal, and he was released from segregation after several days.

After he was later convicted and imprisoned, Vogelsberg—with the aid of another inmate—sued Dr. Kim and multiple nurses under 42 U.S.C. § 1983 for violating his Fourteenth Amendment rights by failing to treat his abdominal pain or diagnose his ulcer. Alleging a policy of poor medical care, he also sued the jail's medical contractor and Dane County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). He further maintained that his placement on self-harm watch was punishment for orally complaining to the doctor about inadequate treatment, in violation of his rights under the First Amendment. Last, Vogelsberg claimed that Dr. Kim committed malpractice (under state law) by simultaneously prescribing naproxen and warfarin, allegedly causing his ulcer and intestinal bleeding.

During discovery, Vogelsberg moved for the appointment of a guardian ad litem or, alternately, recruitment of counsel. *See* FED. R. CIV. P. 17(c)(2); 28 U.S.C. § 1915(e)(1). He cited his mental-health conditions as the reason he required assistance. The district court denied the motion, explaining that Vogelsberg's performance at a deposition, the number and clarity of his filings, and his communications with the court demonstrated his competence to litigate his federal claims, which did not appear overly complex. And the court determined that recruitment of counsel for the state-law malpractice claims (which would require a medical expert, under Wisconsin law) was premature until the court decided if it would ultimately retain jurisdiction over those claims.

The defendants moved for summary judgment. In response, Vogelsberg moved for more discovery, contending he had not yet obtained sufficient evidence to oppose summary judgment. *See* FED. R. CIV. P. 56(d). The district court denied Vogelsberg's

motion, noting that he mostly renewed already-adjudicated discovery disputes and failed to explain what other evidence might help him oppose the defendants' motion.

The court then granted the motion for summary judgment. It concluded that Vogelsberg had not countered the defendants' evidence that his medical care comported with the Constitution. He also lacked evidence that Dr. Kim ordered either medical observation or, later, a psychiatric evaluation to punish him for his criticisms. Indeed, it is not difficult to imagine a different legal action against Dr. Kim if he had not given such orders. And because Vogelsberg could not establish an underlying constitutional violation, his *Monell* claim also failed. Having disposed of the federal claims, the court relinquished supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C § 1367(c)(3).

On appeal, Vogelsberg first challenges the entry of summary judgment, a decision that we review de novo. *James*, 959 F.3d at 314. Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). For his claim to survive summary judgment, Vogelsberg needed evidence that his ulcer was a serious medical condition—something the defendants do not dispute—and that the defendants' response was objectively unreasonable. *Williams*, 937 F.3d at 942. Unlike the more demanding "deliberate indifference" standard under the Eighth Amendment, "[t]his standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively . . . whether the response was reasonable." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). This standard does not reach negligent conduct; rather, the plaintiff must show the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda*, 900 F.3d at 354.

Vogelsberg's central assertion on appeal is that the doctor and nurses "did nothing" for his medical condition beyond prescribe naproxen, which they knew was ineffective for his stomach pain. A constitutional violation can occur when medical providers persist in a treatment known to be ineffective or when there is an "inexplicable delay" in treatment that worsens or prolongs the patient's suffering. *See Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020). Here, however, Vogelsberg did not present evidence that would allow a jury to conclude either that the medical staff delayed treatment or unreasonably persisted in ineffective treatment.

The undisputed facts show that Vogelsberg was seen promptly and regularly by the medical staff when he complained of stomach pain between July and September 2014. Throughout this time, Dr. Kim prescribed and adjusted medications, ordered numerous diagnostic tests, and monitored his worsening condition. Vogelsberg does not dispute that his blood tests were normal until September. And when he reported new symptoms that suggested possible internal bleeding, the doctor adjusted treatment again and ordered Vogelsberg to the hospital immediately after abnormal test results. This "persistent and reasoned medical attention" by Dr. Kim and the nurse defendants is not consistent with unreasonable medical care. *Williams*, 937 F.3d at 944.

Indeed, Vogelsberg does not specifically challenge anything but Dr. Kim's decision to prescribe naproxen along with warfarin. But there is no evidence to suggest he did so without regard to the consequences, and even if the decision was negligent, that is not enough to show that it was objectively unreasonable. *McCann*, 909 F.3d at 866. And to the extent that Vogelsberg suggests that earlier testing, such as an x-ray, would have resulted in a faster diagnosis, he only speculates; further, disagreement with a doctor's chosen course of treatment does not make the treatment objectively unreasonable. *Williams*, 937 F.3d at 944.

Vogelsberg's claim that he was punished for complaining to Dr. Kim about poor medical care fares no better. Assuming his complaint was protected speech, *see Herron v. Meyer*, 820 F.3d 860, 864 (7th Cir. 2016), the proposed "segregation" was for medical observation, not punishment. According to Vogelsberg, the doctor suspected (correctly, as it turns out) that Vogelsberg was bleeding internally. The other act that Vogelsberg cites—the doctor and a nurse falsely asserting that he might be suicidal, leading to the psychiatric evaluation when he returned from the hospital—also was not punitive. Vogelsberg does not dispute that a correctional officer independently raised concerns about his risk of self-harm. Vogelsberg needed some evidence that his complaint was at least a motivating factor in the decision to place him under observation, *see Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009), and his speculation that it related to his complaint is insufficient by itself, *see Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017). Indeed, without evidence that the correctional officer knew (or cared) that he had complained to Dr. Kim—unlikely, based on the timing—the theory is implausible.

Finally, Vogelsberg challenges the denial of his motion to recruit counsel or appoint a guardian ad litem. Despite Vogelsberg's diagnosed mental illnesses, the district court reasonably concluded that Vogelsberg's filings and communications demonstrated that he was mentally competent under the applicable Wisconsin law for

appointing a guardian and capable of litigating his case for purposes of our precedent on the recruitment of counsel. *See Kainz v. Ingles*, 2007 WI App 118, ¶ 52, 300 Wis. 2d 670, 705, 731 N.W.2d 313, 331 (providing factors to determine mental competence); *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc). Vogelsberg points to his use of jailhouse lawyers to explain the clarity of his filings, but the court also relied on Vogelsberg's unassisted performance at his deposition and court hearings. The district court took both requests seriously, identified the applicable law, and arrived at reasonable decisions, so it did not abuse its discretion. *See Pruitt*, 503 F.3d at 658.

Two matters remain. First, because Vogelsberg does not present any argument about liability for the county or medical contractor, he has waived that issue on appeal. *Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018). Second, the district court properly relinquished its jurisdiction over the state-law claims when it resolved all the federal claims; however, subject to any restraints under state law, Vogelsberg may pursue those claims in the appropriate state court. *See* 28 U.S.C. § 1367(c)(3).

AFFIRMED